NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 180517-U

NO. 4-18-0517

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 4, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JOSEPH A. WHITNEY, | ) | No. 17CF1795 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed, concluding defendant was not entitled to a new trial where (1) the admission of allegedly improper propensity evidence was harmless, (2) the State did not engage in misconduct, and (3) the trial court properly admonished the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 2   Following a February 2018 jury trial, defendant, Joseph A. Whitney, was convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)). Defendant appeals, arguing he is entitled to a new trial because (1) the trial court erroneously allowed the admission of improper propensity evidence; (2) the State made inflammatory remarks rising to the level of misconduct, or alternatively, defense counsel was ineffective for failing to preserve the issue; and (3) the trial court failed to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        In December 2017, the State charged defendant with domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(1) (West 2016)), alleging that defendant knowingly caused bodily harm to Erin Jolley, a family or household member of defendant, in that he punched her in the eye and had been previously convicted of domestic battery against a family or household member in Champaign County case No. 17-CM-752.

¶ 5                                    A. Jury Trial

¶ 6        In February 2018, defendant's case proceeded to a jury trial.

¶ 7                                    1. *Voir Dire*

¶ 8        During jury selection, the trial court divided the venire members into three panels. After the parties accepted the first panel, the trial court admonished the panel as follows:

> "THE COURT: All right. For Juror Number 93, Juror Number 122, Juror Number 12, and Juror Number 145, the four of you understand that the defendant is presumed innocent of the charge against him. That before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. That the defendant is not required to offer any evidence on his own behalf, and that if the defendant does not testify, that fact cannot be held against him in any way. The four of you understand those instructions; is that correct?
>
> [No audible responses.]
>
> THE COURT: And they answer in the affirmative. And the four of you will follow those instructions; is that correct?
>
> JUROR NUMBER 145: Yes.
>
> [No audible responses from Juror 12, Juror 122, and Juror 93.]

THE COURT: And they answer in the affirmative."

¶ 9          After the parties accepted the second panel, the trial court admonished the panel members as follows:

"THE COURT: All right, for Juror Number 92, Juror Number 73, Juror Number 60, and Juror Number 147, the four of you understand that the defendant is presumed to be innocent of the charge against him. That before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. That the defendant is not required to offer any evidence on his own behalf, and that if the defendant does not testify, that fact cannot be held against him in any way. The four of you understand those instructions; is that correct?

JUROR NUMBER 92: Yes.

JUROR NUMBER 73: [Indicating].

JUROR NUMBER 60: Yes.

JUROR NUMBER 147: Yes, sir.

THE COURT: And the four of you will follow those instructions; is that correct?

JUROR NUMBER 92: Yes.

JUROR NUMBER 73: [Indicating].

JUROR NUMBER 60: Yes.

JUROR NUMBER 147: Yes, sir.

THE COURT: And they answer in the affirmative now."

¶ 10          The parties then accepted the third panel, and the trial court admonished the panel members as follows:

"THE COURT: All right. For Jurors Number 132, 76, 10, and 138 [*sic*], the four of you understand that the defendant is presumed to be innocent of the charge against him. That before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. That the defendant is not required to offer any evidence on his own behalf, and that if the defendant does not testify, that fact cannot be held against him in any way. The four of you understand those instructions; is that correct?

JUROR NUMBER 76: Yes.

JUROR NUMBER 10: Yes.

JUROR NUMBER 132: Yes.

JUROR NUMBER 38: Yes.

THE COURT: And they answer in the affirmative. And the four of you will follow those instructions; is that correct?

JUROR NUMBER 76: Yes.

JUROR NUMBER 10: Yes.

JUROR NUMBER 132: Yes.

JUROR NUMBER 38: Yes.

THE COURT: And they answer in the affirmative."

¶ 11                                          2. *Trial*

¶ 12        Prior to opening statements, defense counsel brought to the court's attention that the State had not filed a motion to present propensity evidence, and therefore, she "just want[ed] to make sure that the State informs their witnesses that they are not to bring up any allegations of

other domestic violence allegations [*sic*]." The State and the court agreed that the State's witnesses would only testify regarding the events in this case.

¶ 13                                         a. The State's Case-in-Chief

¶ 14        Prior to the State's case-in-chief, the assistant state's attorney made the following remarks during opening statements:

> "Good morning, ladies and gentlemen. In those days leading up to Christmas, people do things like bake cookies, hang out with their children, hang out with their family, watch movies, listen to music, wrap gifts and wonder about those gifts they might receive. Around December 19th of 2017 Erin Jolley received a gift she had not wanted, a beating from her boyfriend."

¶ 15        Following opening statements, the State's evidence showed the following. In December 2017, Erin Jolley and defendant were involved in an "on-again, off-again" dating relationship and lived together in a trailer home in Fisher, Illinois. Jolley's children, a boy and girl, also lived in the home. Jolley testified her children did not own any "baseballs or other sports balls."

¶ 16        Jolley testified that on the evening of December 19, 2017, defendant was "playing on his phone" and drinking beer before leaving their trailer home. While defendant was gone, Jolley walked over to her neighbor Anna Bair's trailer home in order to borrow toothpaste. When Jolley returned to her home, defendant "started punching [her] in [her] face." During this altercation, defendant was "yelling stuff," and Jolley "went down" and covered her head with her forearms. Defendant punched Jolley's head and face with a closed fist. Jolley did not know why defendant hit her. After he stopped, Jolley put her children to bed and went to sleep on the couch in the living room. Jolley testified she did not initially call the police or seek other help because

she did not own a phone or a car and defendant would not let her leave. Jolley was afraid defendant would hurt her more if she attempted to leave because he threatened to kill her if the police found out. Jolley testified she sustained a black eye and a bruise to her chest as a result of the incident.

¶ 17 On December 23, 2017, Bair's six-year-old son Gabriel came over to Jolley's home asking to play with her children. After Jolley informed Gabriel the children were not available to play, Gabriel asked Jolley about her appearance. Jolley told Gabriel she had been hit with a baseball. Jolley testified she lied to Gabriel because she did not want "to get *** more hurt" or "cause more problems" by telling him the truth. The next day, Jolley walked to her mother's home accompanied by her two children. Jolley's mother, her mother's boyfriend Jessie Shelmadine, and Jolley's two other children were present. The police were then called to the residence.

¶ 18 When the police arrived, officers took photographs of Jolley's injuries, which were admitted into evidence. The photographs showed bruising to Jolley's face and chest.

¶ 19 On cross-examination, Jolley testified that when she met defendant in May 2017, he was living with another woman in the neighborhood named Cheri Beasley. Jolley denied that defendant and her neighbor Anna Bair were also in a dating relationship at the same time she dated defendant. Jolley also denied that defendant spent the night at Bair's home on December 23, 2017, and that she told Bair on the same date that she had been hit with a baseball. Jolley denied "seeking revenge" on defendant because of his relationships with Beasley and Bair.

¶ 20 Jessie Shelmadine testified that on December 24, 2017, he was in a dating relationship with Jolley's mother and lived with her in Fisher, Illinois. When asked whether he saw Jolley that morning, Shelmadine responded that he "was awakened by [Jolley's] mother

screaming 'he did it again.' " Defense counsel objected to this testimony and moved to strike, but the court overruled the objection. When Shelmadine came out to the living room, he observed that Jolley looked "[l]ike she had just had the s*** beat out of her." Specifically, "[t]he whole left side of her face was yellowish-green looking," and she had a black eye. The entire left side of her face was swollen. After asking Jolley what happened to her, Shelmadine called the police. When asked why he called the police, Shelmadine responded, "Because it needed to stop." When asked what needed to stop, defense counsel objected, and the court sustained the objection.

¶ 21 Finally, Officer Ted Nemecz testified that on December 24, 2017, he responded to a call at 410 South Fifth Street in Fisher, Illinois. Upon his arrival, he spoke with Jolley and observed that she had a large bruise to her eye. Officer Nemecz testified Jolley informed him of how she received her injuries and explained why she did not seek help sooner, and that her explanation "ma[d]e sense" to him. Officer Nemecz took photos of Jolley's injuries to her face and chest. After meeting with Jolley, Officer Nemecz traveled to Jolley's trailer home and located defendant there. Officer Nemecz observed that defendant's pupils were constricted and his speech was incoherent. When asked about Jolley's injuries, defendant told Officer Nemecz that Jolley was hit with a baseball. Defendant stated at one point that Jolley's parents told him this and later that it was Bair who told him. Defendant stated that the injury occurred the day before, on December 23, 2017. However, Officer Nemecz found this to be inconsistent with the condition of Jolley's injuries "[b]ecaµse the bruises had already appeared to have started healing." Officer Nemecz arrested defendant.

¶ 22 b. Defendant's Case-in-Chief

¶ 23 Anna Bair testified she was currently involved in a sexual relationship with defendant. To Bair's knowledge, defendant and Jolley never resided together in Jolley's trailer

- 7 -

home; rather, defendant lived in a trailer next door to Jolley's. On December 23, 2017, Jolley came to Bair's trailer home, where Bair's brother allowed her to use the phone. Jolley informed Bair that she had been playing baseball with her son when "[s]he looked off, and [the baseball] hit her in the eye." Bair testified she had seen Jolley on December 20, 2017, and she did not have an injury to her eye at that time. Defendant spent the night at Bair's home on December 23, 2017. On cross-examination, Bair testified she did not see Jolley get hit with a baseball.

¶ 24                          c. Arguments and Verdict

¶ 25          During closing argument, the State began as follows:

"In those days leading up to Christmas, people do things like bake cookies, hang out with their children, hang out with their family, watch movies, listen to music, wrap gifts and wonder about those gifts they might receive. Around December 19th of 2017 Erin Jolley received a gift she had not wanted, a beating from her boyfriend."

¶ 26          The State later referenced the testimony of Jessie Shelmadine:

"Jessie, [Jolley's] mother's boyfriend, took the stand and said he was in bed that morning, and he was woken up by [Jolley's] mom, screaming, 'He did it again.' Jessie told you that he got out of bed, came down, looked at [Jolley], told—told you, she looked like she just got the s*** beat out of her, because she showed up looking like this.

He told you that he saw her, and he made the decision, and he called 911. He told you the reason that he called 911 was, it needed to stop."

¶ 27          The State further argued that on the morning of December 24, 2017, defendant was intoxicated when he spoke to Officer Nemecz and the version of events he told the police

was therefore not credible. Finally, the State argued that Bair's testimony was also not credible because of her relationship with defendant.

¶ 28        Following arguments, the jury found defendant guilty of domestic battery.

¶ 29                            B. Sentencing

¶ 30        In March 2018, defendant filed a motion for a new trial, arguing that the trial court erred when it overruled his objections to, among other things, Shelmadine's testimony that he woke up to Jolley's mother screaming "he did it again." The court denied the motion and sentenced defendant to three years in prison. Defendant filed a motion to reconsider the sentence, which the trial court also denied.

¶ 31        This appeal followed.

¶ 32                            II. ANALYSIS

¶ 33        On appeal, defendant argues he is entitled to a new trial because (1) the trial court erroneously allowed the admission of improper propensity evidence; (2) the State engaged in a pattern of misconduct, or alternatively, defense counsel was ineffective for failing to preserve the issue for appeal; and (3) the trial court failed to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We discuss each of these issues in turn.

¶ 34                        A. Propensity Evidence

¶ 35        Defendant first argues the trial court erroneously allowed the admission of improper propensity evidence. Specifically, defendant argues the trial court abused its discretion when it overruled defense counsel's objection to Jessie Shelmadine's "highly prejudicial" testimony that he "was awakened by [Jolley's] mother screaming 'he did it again.' "

¶ 36                            1. *Forfeiture*

¶ 37    As a preliminary matter, the State argues that although defense counsel made a general objection to the allegedly improper testimony and argued in the posttrial motion that the trial court erred by overruling that objection, defendant nonetheless forfeited any argument the testimony constituted improper propensity evidence by failing to specify the basis for the objection and error. We disagree.

¶ 38    In order to preserve an alleged error for appeal, a party must object at trial and file a written posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27, 996 N.E.2d 575. The Illinois Rule of Evidence 103(a)(1) (eff. Oct. 15, 2015) states: "(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." See also *People v. Harris*, 2014 IL App (2d) 120990, ¶ 19, 11 N.E.3d 399 (finding the defendant did not forfeit evidentiary issue where it was clear the basis for the objection was due to a lack of foundation).

¶ 39    Here, we conclude defendant has not forfeited the issue because the basis for defense counsel's objection was clear from the context of the proceedings. Prior to trial, defense counsel noted that the State had not filed a motion to introduce propensity evidence and wanted to "make sure that the State informs their witnesses that they are not to bring up any allegations of other domestic violence allegations [*sic*]." The State agreed and replied that it had informed all of its witnesses "to not mention anything other than this incident." In reviewing the record, we find defense counsel's objection to Shelmadine's statement that he awoke to Jolley's mother screaming, " 'He did it again,' " was clearly intended as a continuing objection to the introduction of any propensity evidence. Because defense counsel also argued in her posttrial

motion that the trial court erred by overruling this objection, we find the issue was properly preserved and will consider it.

¶ 40                                     2. *Applicable Law*

¶ 41        "The determination as to whether evidence is relevant and admissible is within the sound discretion of the trial court, and its ruling will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Gonzalez*, 379 Ill. App. 3d 941, 948-49, 884 N.E.2d 228, 235 (2008).

¶ 42        The Illinois Rules of Evidence provide, with certain specified exceptions, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). If the State wishes to present evidence of a criminal defendant's prior commission of domestic violence offenses in a prosecution for domestic violence, it must comply with section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4(a) (West 2016)).

¶ 43        If a reviewing court determines certain evidence was improperly admitted, it must then determine whether that error was harmless. See *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 97, 39 N.E.3d 1101. " 'The improper admission of evidence is harmless where there is no reasonable probability that, if the evidence had been excluded, the outcome would have been different.' " *Id.* (quoting *People v. Brown*, 2014 IL App (2d) 121167, ¶ 28, 11 N.E.3d 882). To determine whether an error is harmless, the court " 'may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *Id.* ¶ 98 (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43, 902 N.E.2d 600, 617 (2008)).

- 11 -

¶ 44     Here, we conclude that defendant's argument must fail because even assuming *arguendo* the court erred in overruling defense counsel's objection to Shelmadine's allegedly improper propensity testimony, we find the alleged error was harmless. First, we note that Shelmadine's testimony that he awoke to Jolley's mother screaming, " 'He did it again,' " was not responsive to the State's question: whether Shelmadine had an opportunity to see Jolley on the morning he called the police. Immediately following defense counsel's objection, the State did not acknowledge Shelmadine's statement regarding what Jolley's mother said and moved on. Shelmadine did not specifically discuss any other instances of domestic violence involving defendant. It is not likely that this isolated statement, which we acknowledge was repeated once by the State during closing argument, contributed to the conviction. Moreover, the other properly admitted evidence—including the testimony of Jolley and Officer Nemecz and the photographs of Jolley's injuries—overwhelmingly supported the jury's verdict. Even acknowledging certain minor inconsistencies in Jolley's testimony, such as exact dates and how many times she left the trailer after the incident, it was within the province of the jury to "weigh the credibility of witnesses and to resolve conflicts or inconsistencies in their testimony," and we will not disturb those determinations on review. See *People v. Digirolamo*, 179 Ill. 2d 24, 46, 688 N.E.2d 116, 126 (1997). Accordingly, we find the alleged error was harmless and did not result in manifest prejudice to defendant.

¶ 45          B. Prosecutorial Misconduct and Ineffective Assistance

¶ 46     Defendant next argues the State engaged in a "pattern of misconduct when she made inflammatory remarks in opening statement and closing argument about the alleged battery occurring near Christmas" and "repeatedly elicited barred propensity testimony designed to

prejudice the defense." Alternatively, defendant argues trial counsel was ineffective for failing to object to this alleged misconduct.

¶ 47                    1. *Plain Error*

¶ 48            As a preliminary matter, defendant acknowledges he has forfeited his argument regarding prosecutorial misconduct and argues we should review the issue for plain error. The plain-error doctrine allows a court to disregard a defendant's forfeiture and consider unpreserved error in two instances:

> "(1) where a clear or obvious error occurred and the evidence is so closely
>
> balanced that the error alone threatened to tip the scales of justice against the
>
> defendant, regardless of the seriousness of the error and (2) where a clear or
>
> obvious error occurred and that error is so serious that it affected the fairness of
>
> the defendant's trial and challenged the integrity of the judicial process." *People*
>
> *v. Belknap*, 2014 IL 117094, ¶ 48, 23 N.E.3d 325.

¶ 49            Under both prongs of the plain-error analysis, the burden of persuasion remains with the defendant. *People v. Wilmington*, 2013 IL 112938, ¶ 43, 983 N.E.2d 1015. As the first step in the analysis, we must determine whether any error occurred at all. *People v. Eppinger*, 2013 IL 114121, ¶ 19, 984 N.E.2d 475. "If error did occur, we then consider whether either prong of the plain-error doctrine has been satisfied." *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31, 972 N.E.2d 1272. Accordingly, we first consider whether the assistant state's attorney's alleged misconduct constituted a clear or obvious error.

¶ 50                    2. *Applicable Law*

¶ 51            The United States and Illinois Constitutions guarantee the right of all criminal defendants to a fair and impartial trial. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. This

includes the right to a trial free from "pervasive prosecutorial misconduct that deliberately undermines the process by which we determine a defendant's guilt or innocence." (Internal quotation marks omitted.) See *People v. Wheeler*, 226 Ill. 2d 92, 122, 871 N.E.2d 728, 744 (2007) (quoting *People v. Johnson*, 208 Ill. 2d 53, 117, 803 N.E.2d 405, 442 (2003)).

¶ 52 An opening statement should inform "the jury of what each party expects the evidence to prove," and it "may include a discussion of the expected evidence and reasonable inferences from the evidence." *People v. Kliner*, 185 Ill. 2d 81, 127, 705 N.E.2d 850, 874 (1998). Similarly, "[t]he prosecutor may comment during closing argument on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant." *People v. Perry*, 224 Ill. 2d 312, 347, 864 N.E.2d 196, 217-18 (2007). "While the State has wide latitude in making opening statements and closing arguments and is entitled to comment on the evidence [Citation], comments intending only to arouse the prejudice and passion of the jury are improper." *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21, 69 N.E.3d 226. "[C]omments that exceed the bounds of proper argument require reversal [citation], only if the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them[.]" (Internal quotation marks omitted.) *Id.* ¶ 23 (quoting *People v. Williams*, 192 Ill. 2d 548, 573, 736 N.E.2d 1001, 1015 (2000), and *Wheeler*, 226 Ill. 2d at 123). If a defendant alleges multiple instances of misconduct, the reviewing court may consider their cumulative effect. See *People v. Blue*, 189 Ill. 2d 99, 120, 724 N.E.2d 920, 931 (2000). Whether a prosecutor's improper statements at trial were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*. See *Wheeler*, 226 Ill. 2d at 121.

¶ 53 3. *This Case*

¶ 54	Defendant argues the following constituted a pattern of prosecutorial misconduct, the cumulative effect of which prejudiced defendant: (1) remarks during opening statement and closing argument that defendant's battery of Jolley was "a [Christmas] gift that she had not wanted"; (2) eliciting improper propensity evidence from Jessie Shelmadine, specifically his testimony that he awoke to Jolley's mother screaming, " 'He did it again,' " and that he called the police because "it needed to stop"; and (3) repeating the allegedly improper propensity evidence during closing argument.

¶ 55	We conclude that the cumulative effect of the aforementioned statements did not rise to the level of prosecutorial misconduct.

¶ 56	First, the prosecutor's comparison of defendant's battery of Jolley to a Christmas gift was "nothing more than [an] idiomatic expression[ ]," which was "commonplace enough that a jury would not misconstrue [it]." Compare *People v. Moore*, 358 Ill. App. 3d 683, 692, 832 N.E.2d 431, 440 (2005) (concluding prosecutor's statement that a bullet in the victim's head was an "early Christmas gift" was not improper) with *Jones*, 2016 IL App (1st) 141008, ¶ 24 (holding a new trial was warranted where the prosecutor repeatedly called the defendant, who had never been convicted of a crime, a "cold-blooded criminal") and *People v. Johnson*, 119 Ill. 2d 119, 139-40, 518 N.E.2d 100, 109-110 (1987) (holding that the prosecutor's characterization of the defendant as an "animal" was improper but ultimately not prejudicial).

¶ 57	Neither do we find that the State's reference to Shelmadine's testimony that he awoke to Jolley's mother screaming, " 'He did it again,' " rose to the level of misconduct. As stated above, this testimony was not responsive to the question the State actually asked—*i.e.*, whether Shelmadine had the opportunity to see Jolley on the morning he called the police. Clearly, the State did not intentionally elicit such a response. Moreover, the State mentioned this

remark only once during closing argument, rendering it unlikely that the jury returned a guilty verdict on that basis.

¶ 58        Additionally, it was not improper for the State to repeat Shelmadine's testimony that he called the police because "it needed to stop." Shelmadine's statement was ambiguous and does not clearly constitute a reference to any previous wrongdoing by defendant, let alone a specific instance of domestic violence. Moreover, defense counsel did not object to Shelmadine's testimony that "it needed to stop," but rather to the State's follow-up question of *what* needed to stop, which the trial court sustained. The assistant state's attorney was thus permitted to repeat the testimony during closing argument, and we note that she remarked—without speculating what "it" was—only that this was Shelmadine's stated reason for contacting the police. Furthermore, the State's reference to this statement came immediately after describing what Jolley looked like that morning and right before noting that Jolley did not want police involved "because she was afraid that if the police got involved, the defendant would hurt her more." In this context, we agree with the State that "[a]t most, Shelmadine's answer would have been referring to the possibility of future abuses, not past." Finally, the jury was properly instructed that opening and closing statements are not evidence, and we will presume that it followed the law pursuant to that instruction. See *People v. Foster*, 195 Ill. App. 3d 926, 950, 552 N.E.2d 1112, 1129 (1990).

¶ 59        We conclude that none of the complained-of remarks from the State rose to the level of misconduct. We therefore find no clear or obvious error occurred, and we will honor defendant's forfeiture. Because we find no underlying error, we need not consider defendant's alternative argument that defense counsel was ineffective for failing to preserve this alleged error for appeal. See, *e.g.*, *People v. Pecoraro*, 144 Ill. 2d 1, 17-18, 578 N.E.2d 942, 949 (1991)

(concluding defense counsel was not ineffective for failing to preserve meritless claim of improper remarks by the prosecutor during closing arguments).

¶ 60                                    C. Jury Admonishments

¶ 61        Finally, defendant argues he is entitled to a new trial because the trial court failed to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when it (1) asked the venire if they "would follow" instead of "accepted" the principles enumerated in the rule and (2) by not asking the venire about each principle individually.

¶ 62        Defendant acknowledges that he has forfeited this issue by failing to object at trial and file a written posttrial motion. He nonetheless asks that we review the issue for plain error. As discussed *supra*, we must first consider whether a clear or obvious error occurred. *Eppinger*, 2013 IL 114121, ¶ 19.

¶ 63        The Illinois Supreme Court adopted Rule 431(b) to ensure compliance with the requirements of *People v. Zehr*, 103 Ill. 2d 472, 476, 469 N.E.2d 1062, 1063-64 (1984). Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) states as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."

¶ 64 Rule 431(b) simply "mandates a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010). However, "Rule 431(b) has no requirement that the trial court ask separate questions of the jurors about each individual principle. [Citation.] Nor does the rule require separate, individual answers from each juror." *People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97, 927 N.E.2d 1265, 1270 (2010) (approving of the trial court's questioning if each juror understood the four *Zehr* principles and would "follow" them). Additionally, "the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607.

¶ 65 Here, the trial court asked the jurors in groups of four both (1) if they understood all four principles and (2) if they would "follow" all four *Zehr* principles. The trial court expressly asked if the jurors "understood" the four principles and, we submit, asking if they will "follow" the principles is the functional equivalent of asking if they "accept" them. This same questioning passed muster in *Willhite* and does so again in this case. However, our previous willingness to affirm, based on our standard of review, should not be misinterpreted as condoning it. We encourage trial courts to simply read the language of Rule 431(b) to avoid the issue entirely. Considering the clear language of the Rule and the ease with which courts could comply, it remains somewhat baffling why any trial court would continue to guarantee creation of an issue on appeal, even if it was not an issue to the parties at trial. Finally, we note that the court allowed for each juror to respond individually as to whether they understood the principles, and again as to whether they would follow them; it was not required to ask the venire about each principle individually. See *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 62. We conclude the trial court complied with Rule 431(b) and no clear or obvious error occurred. We need not proceed with a plain error analysis.

¶ 66                              III. CONCLUSION

¶ 67            For the reasons stated, consistent with Illinois Supreme Court Rule 23(b) (eff.

Apr. 1, 2018),we affirm the trial court's judgment.

¶ 68            Affirmed.