NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 220813-U

NO. 4-22-0813

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 1, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ogle County |
| EVERETT L. BRADLEY, | ) | No. 18CF26 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John B. Roe IV, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed defendant's convictions of aggravated domestic
battery and aggravated battery.

¶ 2     Defendant, Everett L. Bradley, was convicted of aggravated domestic battery (720

ILCS 5/12-3.3(a-5) (West 2018)) and aggravated battery (*id.* § 12-3.05(b)(2)) following a jury

trial. The trial court sentenced him to concurrent five-year prison terms. Defendant appeals,

arguing (1) the court erred in admitting prejudicial statements about his other crimes or bad acts

as part of a recorded interview with the alleged victim, (2) his attorney provided ineffective

assistance in failing to properly impeach the alleged victim's testimony, (3) the court erred in

admitting his two prior convictions for aggravated driving under the influence (DUI) to impeach

his testimony, and (4) he was denied a fair trial based on the cumulative effect of errors in the

trial. We affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. The Charges

¶ 5          On January 28, 2021, the State filed an amended information charging defendant

with aggravated domestic battery (*id.* § 12-3.3(a-5)), two counts of aggravated battery (*id.* § 12-

3.05(b)(2)), and domestic battery (*id.* § 12-3.2(a)(2)). The State alleged defendant committed the

offenses against B.B., a 12-year-old family or household member, by knowingly strangling him

(count I), grabbing him by the neck, causing bruising (count II), striking him with a belt, causing

red marks on his legs (count III), and making physical contact of an insulting or provoking

nature by pushing him (count IV).

¶ 6                              B. Pretrial Proceedings

¶ 7          Prior to trial, the State filed a motion to admit B.B.'s hearsay statements to

Rochelle Police Detective Brian Albers, B.B.'s cousin Daimon Wilcox, and Jessica Cash from

the Shining Star Children's Advocacy Center (Shining Star) under section 115-10 of the Code of

Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2020)). The State also sought to

introduce a DVD recording of the interview conducted at Shining Star.

¶ 8          At the hearing on the motion, the parties stipulated the interview at Shining Star

was conducted by Traci Mueller. Defendant argued a part at the end of the DVD recording where

Mueller gave her opinion on the events was inadmissible and "almost the entirety of the second

portion of this interview" contained inadmissible statements about defendant's alleged prior

criminal conduct or bad acts. Defendant argued the prejudicial effect of the statements clearly

outweighed any probative value. After taking the matter under advisement to rewatch the

recording, the trial court excluded the interviewer's statement of her opinion but otherwise

allowed the State's motion to admit the statements contained in the recording.

¶ 9        The State also filed a motion *in limine*, seeking to impeach defendant's testimony with his two prior felony convictions of aggravated DUI and a prior felony conviction of driving with a revoked license. Defendant argued the aggravated DUI convictions were overly prejudicial given the alleged alcohol use in this case. The trial court granted the State's motion *in limine* over defendant's objection.

¶ 10                              C. Trial Evidence

¶ 11        At the jury trial, the parties stipulated defendant was previously convicted of aggravated DUI in 2019 and 2020 and he was convicted of driving with a revoked license in 2019. Defendant renewed his objection to the use of the aggravated DUI convictions to impeach his testimony and to the admissibility of the portion of the Shining Star interview containing statements about his prior criminal conduct or bad acts. The trial court maintained its prior rulings on those issues.

¶ 12                              1. *William Hahn*

¶ 13        Rochelle Police Sergeant William Haan testified he was called to the lobby of the police department to speak with defendant at approximately 8:15 p.m. on February 9, 2018, about a missing juvenile. Haan believed defendant was "highly intoxicated" because his speech was slurred, he smelled of alcohol, and his eyes were bloodshot. Defendant stated his 12-year-old son had left home for an unknown reason, and he was wearing dark pants, multicolored tennis shoes, a Cubs jacket, and a hat.

¶ 14        At 11:45 that night, Haan responded to Rochelle Community Hospital for a report of "a juvenile that apparently was abused." When he arrived, Haan spoke with the emergency room staff and B.B.'s cousin, Daimon Wilcox. At approximately 4:45 a.m. on February 10, 2018, Haan and three other police officers went to defendant's residence and spoke to him. Haan

believed defendant was "a little hung over" because he appeared sleepy, but Haan also said defendant may have appeared that way because he was just awakened. Defendant's speech was not slurred at that time. The officers arrested defendant.

¶ 15                                         2. *Daimon Wilcox*

¶ 16          Daimon Wilcox testified he was with B.B. "all the time" and they also communicated using Facebook Messenger. On February 9, 2018, B.B. contacted Wilcox on Facebook Messenger saying he was underneath the stairs at his apartment complex and needed Wilcox to pick him up. When Wilcox arrived at the apartment complex, he messaged B.B. and saw him exit the front door of the building. B.B. came out to Wilcox's car wearing only a T-shirt and basketball shorts with no socks, shoes, or coat. Wilcox testified there was snow on the ground at the time. B.B. seemed confused about what happened when he first entered the car. Wilcox drove to his residence and B.B. took a nap. After he woke up, Wilcox observed red marks around B.B.'s neck, arm, and legs. Wilcox and his girlfriend took B.B. to the hospital, and they drove him back to Wilcox's residence after he was discharged.

¶ 17                                         3. *Brian Albers*

¶ 18          Rochelle Police Detective Brian Albers testified he was called to the hospital by Sergeant Haan at approximately 11:40 p.m. on February 9, 2018. When he arrived, Albers met with B.B. in the hospital emergency room. B.B. was in a hospital gown and Albers noticed bruises and red marks "pretty much all over his body that [Albers] could see; neck, face, there were some on his legs." Albers photographed B.B.'s injuries and the pictures were admitted as People's exhibit Nos. 1 through 11. The exhibits documented bruises and red marks on B.B.'s back, legs, throat area, neck, cheek, and eye. Albers testified B.B. seemed calm when they were talking but he could tell B.B. had been upset earlier. After leaving the hospital, Albers went with

other officers to defendant's residence. Defendant told Albers he was a single parent, B.B. "doesn't do much," and defendant said "something about [B.B.'s] grades." When Albers asked defendant why B.B. was in the emergency room, defendant stated he had nothing further to say. The officers then arrested defendant.

¶ 19                                              4. *B.B.*

¶ 20            B.B. testified he was playing video games in his room on February 9, 2018, when he heard defendant trying to open the door to the apartment. B.B. got up to help because he thought defendant was having trouble opening the door. After B.B. unlocked the door, defendant forced it open, pushed B.B. into a chair, and began yelling. B.B. testified he was scared and confused. Defendant continued to yell "something about me and my cousin stealing money from him." B.B. testified defendant appeared intoxicated because he was "stumbly" and smelled of alcohol.

¶ 21            Defendant kept yelling and walking toward B.B., who backed up until he was in defendant's bedroom. At that point, defendant grabbed B.B. by the back of the neck, threw him into a desk several times, and threw him against a wall. Defendant then choked B.B., placing his hand around B.B.'s neck "really tight" and making it "really hard to breath." Defendant lifted him up against the wall for a couple seconds and then dropped him. B.B. ended up on the floor facedown with defendant standing over him, holding B.B.'s neck between his ankles. Defendant then took his belt off and hit B.B. with it repeatedly on his legs, thighs, buttocks, and back while continuing to hold him in place.

¶ 22            B.B. testified defendant eventually stopped when he ran out of breath. B.B. got up, pushed defendant out of the way, and ran to his room. He grabbed his phone and ran out of the apartment and down the stairs to the bottom floor, where he hid in a crawl space underneath

the stairs. After waiting for a while, B.B. called his cousin, Daimon Wilcox, to come get him. When Wilcox arrived, B.B. ran to his car barefoot. B.B. described the weather as a blizzard. Wilcox drove to his residence, where B.B. took a nap. After he woke up, Wilcox and his girlfriend helped B.B. walk to the car and drove him to the hospital.

¶ 23    B.B. was released from the hospital later that day, and he stayed with Wilcox for a few days. B.B. testified he was covered in bruises when he went back to school. The trial court admitted into evidence People's exhibit Nos. 13 through 17, showing B.B.'s injuries as they appeared a couple days after the incident. The exhibits showed bruising to B.B.'s legs, buttocks, back, and neck. B.B. testified People's exhibit No. 17 showed the bruising on his neck caused by defendant's hand.

¶ 24    On cross-examination, B.B. testified he was wearing a hooded sweatshirt and jeans during this incident. B.B. testified defendant pulled his hooded sweatshirt several times and B.B. felt it against his neck. B.B. remembered defendant accused him of stealing money. When B.B. denied stealing, defendant stated repeatedly that B.B. was lying. B.B. testified he was struggling to get away while defendant held his neck between his legs on the floor. B.B. denied telling anyone the bruising on his neck was caused by his sweatshirt.

¶ 25                    5. *Traci Mueller*

¶ 26    Traci Mueller testified she was a forensic interviewer at Shining Star. She interviewed B.B. on February 15, 2018. A DVD recording of the interview was admitted into evidence as People's exhibit No. 18 and played for the jury. The State then rested.

¶ 27                    6. *Defendant*

¶ 28    Defendant testified he was working on February 9, 2018, when he received a phone call from his friend, Terry Carlton. Defendant and B.B. had lived with Carlton for a few

months at the end of 2017 while defendant recovered from an injury. After work that day, defendant went to Carlton's house and was informed someone had charged $148 to Carlton's card for video games and Google Play Games. Carlton showed defendant documentation of the charges to his account. After seeing the charges, defendant was certain B.B. was responsible for them because defendant had recently bought B.B. a PlayStation 4 game system and neither defendant nor Carlton played video games.

¶ 29       When he arrived home around 5 p.m., defendant confronted B.B. with a bank statement Carlton gave him. B.B. denied charging the items before even looking at the statement. When B.B. continued to deny charging the items, defendant threatened to spank him and B.B. ran toward the hallway. Defendant grabbed the hood on his sweatshirt and B.B. tripped and fell into defendant's bedroom. Defendant continued to hold onto B.B.'s sweatshirt because he was trying to get away. Defendant felt resistance as he held onto the sweatshirt and B.B. struggled to get away. Defendant eventually held B.B.'s neck between his boots as B.B. was lying on the floor, and he spanked B.B. with his belt. Defendant thought he hit B.B.'s buttocks, but it was dark in the room and he was "just swinging." Defendant testified he hit B.B. at least seven times. Defendant denied throwing B.B. into a desk or a wall. After he finished spanking B.B. with the belt, defendant sat down on the couch and B.B. went to his room. After approximately five minutes, B.B. came out of his room and left the apartment.

¶ 30       Defendant then acknowledged his prior convictions of aggravated DUI and driving with a revoked license. Defendant further testified, after B.B. did not return home, he eventually went to the police station and spoke with Sergeant Haan. Defendant was upset because he could not find B.B. Defendant denied drinking alcohol before meeting with Haan. Defendant had one beer after meeting with Haan, but he was not hungover or under the influence

of alcohol or drugs the next morning. Around 4:30 the next morning, police officers arrived at his apartment as he was getting ready for work and arrested him.

¶ 31        Defendant testified he spanked B.B. with a belt because no other discipline was working, including taking his phone, grounding him, and revoking his allowance. Defendant denied placing his hand on B.B.'s throat.

¶ 32                                7. *Carol Wilcox*

¶ 33        Outside the presence of the jury, defense counsel informed the trial court defendant's mother, Carol Wilcox, intended to testify B.B. told her the bruising on his neck was a result of defendant pulling and holding onto his hooded sweatshirt. The State objected to the proposed testimony, arguing it was inadmissible hearsay and not proper impeachment of B.B.'s testimony. The court ruled the proposed testimony was inadmissible hearsay and irrelevant.

¶ 34                                8. *Terry Carlton*

¶ 35        Terry Carlton testified defendant and B.B. lived at his house for a couple of months in 2017. In February 2018, he noticed money had been transferred out of his bank account for video games. After he showed defendant his bank statement, defendant offered to pay Carlton back, but Carlton told him B.B. could work to pay it back. On cross-examination, Carlton testified he could not remember whether defendant paid him back.

¶ 36                        D. Jury Verdicts and Sentencing

¶ 37        Approximately one hour after beginning its deliberations, the jury returned guilty verdicts on aggravated domestic battery (count I) and two counts of aggravated battery (counts II and III). The trial court sentenced defendant to concurrent prison terms of five years for aggravated domestic battery and the aggravated battery conviction contained in count III. A

conviction was not entered on the aggravated battery charge contained in count II because it was a lesser included offense of aggravated domestic battery.

¶ 38        This appeal followed.

¶ 39                                II. ANALYSIS

¶ 40        On appeal, defendant contends (1) the trial court erred in admitting prejudicial statements about his other criminal conduct or bad acts as part of B.B.'s recorded interview with Traci Mueller at Shining Star, (2) he was denied the effective assistance of counsel because his attorney failed to properly impeach B.B.'s testimony, (3) the court erred in admitting his two prior convictions of aggravated DUI for the purpose of impeaching his testimony, and (4) he was denied a fair trial based on the cumulative effect of the errors in the trial. We address defendant's arguments in turn.

¶ 41                        A. Other Crimes or Bad Acts Evidence

¶ 42        Defendant argues the trial court abused its discretion in admitting four different categories of other crimes or bad acts allegations included in B.B.'s statements during his interview at Shining Star. Defendant contends the allegations included statements that (1) he abused alcohol and drugs, (2) he stole items from B.B., (3) he tends to be violent, and (4) he neglected and endangered B.B. Defendant argues those allegations were not relevant to whether he committed the charged offenses in this case and the statements were highly prejudicial. Thus, he argues the court abused its discretion in allowing the statements to be included in the recording of the interview played for the jury because any probative value was outweighed by the danger of unfair prejudice.

¶ 43        "A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence." *People v. Bernette*, 30 Ill. 2d

359, 371, 197 N.E.2d 436, 443 (1964). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence is generally admissible (Ill. R. Evid. 402 (eff. Jan. 1, 2011)), although it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 44 Generally, evidence indicating the defendant committed a prior crime or bad act is inadmissible if its only purpose is to show the defendant's propensity to commit crimes. *People v. McSwain*, 2012 IL App (4th) 100619, ¶ 36, 964 N.E.2d 1174. Evidence of other crimes or bad acts is admissible, however, if it is relevant for any other purpose. *Id.* The evidence may be admissible if it is "part of a continuing narrative of the event giving rise to the offense, intertwined with the charged offense, or explains an aspect of the charge which would otherwise be implausible or inexplicable." *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58, 2 N.E.3d 642.

¶ 45 The rule excluding evidence of other crimes or bad acts for the purpose of establishing a propensity to commit crimes is an aspect of the prohibition on introducing evidence of a character trait of the accused. *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 44, 12 N.E.3d 179 (quoting *People v. Pikes*, 2013 IL 115171, ¶ 16, 998 N.E.2d 1247). " 'The concern is not that such evidence is lacking in probative value, but that it may overpersuade the jury, which might convict the accused because it believes he or she is a bad person.' " *Id.* (quoting *Pikes*, 2013 IL 115171, ¶ 16).

¶ 46        "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion." *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). "Such an abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 47            1. *Statements About Drinking and Use of Controlled Substances*

¶ 48        Defendant contends B.B. made several allegations in the video interview about his alcohol and drug use. B.B. stated defendant was "probably drunk or on drugs" before returning home on the night of the incident and further stated defendant was usually drunk when he came home from work. B.B. stated defendant drank beer daily and vodka sometimes. B.B. also stated defendant used a small mailbox to store cocaine and cannabis, he had observed what he thought was cocaine on defendant's face, he had observed defendant smoking cannabis, and his downstairs neighbor told him she heard a rumor defendant was using drugs. Defendant argues these statements should have been excluded because they are irrelevant and prejudicial.

¶ 49        At trial, B.B. testified defendant appeared intoxicated after he came home because he was "stumbly" and smelled of alcohol. Sergeant Haan also testified defendant appeared "highly intoxicated" when he came to the police department after this incident, asserting his speech was slurred, he smelled of alcohol, and his eyes were bloodshot. Defendant denied drinking alcohol before meeting with Haan, and he denied being under the influence of any alcohol or drugs when the officers came to his residence the following morning. Defendant's condition at the time of this incident was a fact at issue in this case, and the testimony at trial about that issue was relevant.

¶ 50        However, B.B.'s statements in the video interview about defendant's prior alcohol and drug use are not relevant to the issues in this case. The statements identified by defendant involve allegations about his prior alcohol and drug use in general. They are not related to his condition on the night of this incident. Further, they do not relate to the act of physical abuse or involve any detail of the incident at issue in this case. The statements are unfairly prejudicial because they "cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." *People v. Pelo*, 404 Ill. App. 3d 839, 867, 942 N.E.2d 463, 488 (2010). We conclude the trial court abused its discretion in allowing admission of the statements as part of B.B.'s video interview.

¶ 51                            2. *Theft Allegations*

¶ 52        Defendant also contends the trial court abused its discretion in admitting B.B.'s statements about defendant "stealing" his small Christmas mailbox and his smartwatch. Defendant contends the court erred in allowing admission of those statements about alleged criminal conduct because they are irrelevant and prejudicial.

¶ 53        Again, the statements identified here are not related to the incident in question. The allegations are not relevant to the act of physical abuse or any detail pertaining to the incident. Instead, these remarks are simply gratuitous accusations of bad acts by defendant. Although they are not particularly inflammatory, the statements are irrelevant and could only serve to "cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." *Id*. The danger of unfair prejudice from these statements outweighs any probative value. We conclude the trial court's decision to admit the statements was an abuse of discretion.

¶ 54                            3. *Tendency to Be Violent*

¶ 55      Next, defendant argues B.B. made several prejudicial statements in the video interview about his tendency to be violent. B.B. stated defendant told him he killed people who beat and robbed him, defendant previously threatened to kill B.B. with a gun, he previously threw B.B. into a wall, and he stated he wanted to kill B.B. during this incident. Defendant argues those allegations should have been excluded because they were irrelevant and prejudicial.

¶ 56      First, defendant's alleged statement he wanted to kill B.B. during this incident was relevant to the events. The statement shows defendant's state of mind during the incident. It was also relevant to show intent because defendant argued any strangulation accidentally resulted from him pulling B.B.'s hooded sweatshirt. The statement was not unfairly prejudicial. Unfair prejudice occurs when a "jury would be deciding the case on an improper basis, such as sympathy, hatred, contempt, or horror." *Id*. The statement did not "cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." *Id*. Accordingly, the trial court did not abuse its discretion in admitting this statement.

¶ 57      The remaining remarks about defendant stating he killed people who had beaten and robbed him, threatening to kill B.B. with a gun, and throwing B.B. into a wall are irrelevant to this incident. These statements do not relate to this charge of abuse or provide any details about the incident involved in this case. The State does not offer any argument explaining the relevance of defendant's statement about killing people, instead only noting B.B. added he did not believe the statement. While the statement seems outlandish and B.B. asserted he did not even believe it, the statement is also irrelevant to the issues in this case. In the video interview, B.B. also stated he had never seen defendant with a gun and, at one point, B.B. stated he thought the incident when defendant pushed him into a wall was an accident. Although any prejudice from the statements may have been reduced by B.B.'s equivocation about the claims, they are

still irrelevant and could have "cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." *Id*. The danger of unfair prejudice from these statements substantially outweighed any probative value. Accordingly, we find the trial court abused its discretion in admitting these statements as part of the video interview.

¶ 58                                    4. *Neglect and Endangerment*

¶ 59          Finally, defendant argues he was prejudiced by B.B.'s statements in the video interview alleging defendant neglected and endangered him. Specifically, defendant contends B.B. stated defendant's "ex used to poke B.B. with her really sharp nails and hurt him" and defendant "did not report it or stop her." B.B. also stated defendant cut the seatbelt in his truck and then drove recklessly to hurt and frighten him. Defendant acknowledges B.B. stated in the interview he was not sure defendant cut the seatbelt. Defendant also claims B.B. alleged he was neglected because defendant left him home alone frequently and did not cook for him.

¶ 60          A review of the video recording shows B.B. did not claim defendant ever observed or knew about his ex-girlfriend abusing B.B. In the interview, B.B. only stated "we never reported" it. Nonetheless, the statement is irrelevant to the incident at issue here. It does not describe or relate to any detail of the physical abuse at issue in this case. The statement could have reflected negatively on defendant. The danger of unfair prejudice from the statement substantially outweighs any potential probative value.

¶ 61          On the reckless driving allegation, the State notes B.B. conceded "there's a good chance [defendant] might have not actually cut the seatbelt," but the State does not offer any argument explaining the admissibility of the statement alleging defendant drove recklessly to frighten or hurt B.B. The acknowledgement of B.B.'s uncertainty as to whether defendant cut the seatbelt does not resolve the question on the admissibility of the allegation of endangering B.B.

by driving recklessly. The statement is not relevant to the charges in this case, and it is unfairly prejudicial. We also find B.B.'s statement that defendant left him home alone and did not cook for him irrelevant. The statement does not tend to make the existence of any fact of consequence in this case more or less probable. Although it is not particularly inflammatory, the statement could only reflect negatively on defendant. Thus, we find the trial court abused its discretion in admitting these statements.

¶ 62                                    5. *Harmless Error*

¶ 63        The State argues any improper admission of B.B.'s statements from the video interview was harmless error. According to the State, the evidence, including defendant's own testimony, supports the convictions. The State concludes any error in admitting portions of B.B.'s video interview was harmless given the overwhelming evidence presented in this case.

¶ 64        "The improper admission of evidence is harmless where there is no reasonable probability that, if the evidence had been excluded, the outcome would have been different." *People v. Brown*, 2014 IL App (2d) 121167, ¶ 28, 11 N.E.3d 882. In determining whether the erroneous admission of evidence is harmless, a reviewing court may: "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240, 940 N.E.2d 1131, 1145 (2010). In a harmless error review, the State bears the burden of persuasion with respect to prejudice. *People v. McLaurin*, 235 Ill. 2d 478, 495, 922 N.E.2d 344, 355 (2009).

¶ 65        We conclude the trial court's error in admitting B.B.'s statements in the video interview was harmless because the evidence against defendant was overwhelming and the error

did not contribute to his convictions. B.B. testified defendant beat him repeatedly with his belt, causing injuries to his legs, thighs, buttocks, and back. B.B. testified defendant stopped only after he ran out of breath. Following the beating, B.B. ran out of the apartment without socks, shoes, or a coat despite the winter weather on the night of the incident. B.B.'s account of the incident in his video interview is substantially consistent with his testimony at trial. Daimon Wilcox described B.B.'s injuries as red marks on his neck, arm, and legs, and they were severe enough that Wilcox took B.B. to the hospital. When Detective Albers met with B.B. in the emergency room, he observed bruises and red marks "pretty much all over his body that [Albers] could see; neck, face, there were some on his legs." Defendant does not dispute those basic facts, testifying he hit B.B. with his belt at least seven times while B.B. was lying on the floor.

¶ 66        Defendant, however, argues the evidence did not show he "strangled" B.B., as required to establish the offense of aggravated domestic battery. The aggravated domestic battery statute provides, in pertinent part,

> "[a] person who, in committing a domestic battery, strangles another individual commits aggravated domestic battery. For the purposes of this subsection (a-5), 'strangle' means intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." 720 ILCS 5/12-3.3(a-5) (West 2018).

The jury was instructed on the definition of the term "strangle" that was contained in the statute. See Illinois Pattern Jury Instructions, Criminal, No. 11.107A (approved April 13, 2016). Defendant testified he held onto B.B.'s hooded sweatshirt after he fell because "he was squirming, trying to get away from me and I was trying to spank him." Defendant felt resistance

on the sweatshirt. In this case, B.B. testified defendant placed his hand around B.B.'s neck, making it "really hard to breath," and he also asserted defendant pulled his hooded sweatshirt. According to B.B., defendant stated he wanted to kill B.B. during the incident, showing defendant's state of mind and intent.

¶ 67    Importantly, the pictures admitted into evidence show significant red marks and bruising on B.B.'s throat and neck. B.B. testified they depicted the bruising on his neck caused by defendant choking him with his hand. The pictures certainly support the charge that defendant intentionally impeded B.B.'s normal breathing or circulation of his blood by applying pressure on his throat or neck. See 720 ILCS 5/12-3.3(a-5) (West 2018). B.B.'s account of the events is supported by the pictures of his injuries. Defendant's testimony, on the other hand, is undermined by those pictures and his uncertainty about the events. Defendant testified he thought he hit B.B. on the buttocks, but it was dark in the room and he was "just swinging." The pictures admitted into evidence show injuries all over B.B.'s body, including his back, legs, buttocks, face, neck, and throat. Defendant even admitted during his testimony he was "shocked" by the pictures of B.B.'s injuries because he "wasn't aware that might, that happened." Additionally, the State presented testimony that defendant was intoxicated during the events and afterward when he spoke with Detective Haan.

¶ 68    We also note the improperly admitted statements in B.B.'s video interview were part of a lengthy interview lasting approximately 1 hour and 13 minutes. B.B. stated he did not even believe many of the statements, including defendant's statement he killed the people who beat and robbed him and his statement that he cut the seatbelt in his truck. Additionally, some of the statements were not particularly inflammatory. Although we have found they should have been excluded, the improper remarks could not have contributed to the convictions given the

overwhelming evidence against defendant. In sum, we conclude there is no reasonable probability that the outcome of the trial would have been different if the improperly admitted evidence had been excluded. Accordingly, we find the trial court's error in admitting the statements was harmless.

¶ 69                        B. Ineffective Assistance of Counsel

¶ 70         Defendant also contends his attorney provided ineffective assistance by failing to make a valid argument to admit the testimony of his mother, Carol Wilcox, to impeach B.B.'s testimony with his prior inconsistent statement. According to defendant, in his testimony at trial, B.B. denied telling anyone the bruises on his neck were caused by defendant pulling on his sweatshirt, and Carol Wilcox intended to testify B.B. told her the injuries were caused in that manner. Thus, defendant maintains Wilcox's testimony was admissible to impeach B.B.'s testimony with his prior inconsistent statement, and defendant's attorney provided deficient performance by failing to make the appropriate argument to admit her testimony at trial. Defendant concludes, absent counsel's error, the jury likely would have acquitted him of aggravated domestic battery.

¶ 71         To establish a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability, but for counsel's errors, the result of the proceeding would have been different. *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A reasonable probability of a different result is a " 'probability sufficient to undermine confidence in the outcome.' " *People v. Johnson*, 2021 IL 126291, ¶ 54, 202 N.E.3d 220 (quoting *Strickland*, 466 U.S. at 694). A failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v.*

*Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366. Accordingly, a court may proceed directly to the prejudice prong in evaluating a claim of ineffective assistance of counsel. *Johnson*, 2021 IL 126291, ¶ 53.

¶ 72        In this case, we find defendant cannot establish a reasonable probability of a different result if the proffered testimony had been admitted. Defendant testified he held onto B.B.'s hooded sweatshirt after he fell because "he was squirming, trying to get away from me and I was trying to spank him." Thus, defendant's argument about the sweatshirt was before the jury for consideration. Even if Wilcox had provided the testimony, it would not have undermined B.B.'s testimony that defendant grabbed him by the throat and restricted his breathing. Wilcox's proposed testimony did not impeach B.B.'s testimony on that point, but only addressed a cause of the bruising to B.B.'s neck. Indeed, Wilcox's testimony may have provided additional evidence supporting a finding defendant intentionally impeded B.B.'s normal breathing by applying pressure to his throat given the injuries she noticed to B.B. and the pictures depicting those injuries. Wilcox's testimony would not have diminished the impact of the pictures showing the injuries to B.B.'s neck, throat, and other parts of his body. The pictures supported B.B.'s testimony that defendant intentionally impeded his normal breathing by applying pressure to his throat. Additionally, even if it supported defendant, the jury may have viewed Wilcox's testimony as biased given her close family relationship to him, thus likely reducing the effectiveness of any impeachment.

¶ 73        In sum, to establish his claim of ineffective assistance of counsel, defendant was required to demonstrate a reasonable probability of a different result absent counsel's deficient performance. In this case, there is no reasonable probability defendant would have been

acquitted of aggravated domestic battery if Wilcox's testimony had been admitted at trial. Accordingly, defendant has not established his claim of ineffective assistance of counsel.

¶ 74                                C. Impeachment of Defendant's Testimony

¶ 75        Defendant also contends the trial court erred in admitting his two prior aggravated DUI convictions to impeach his testimony. Defendant argues the prior convictions should not have been admitted because their prejudicial impact outweighed any probative value for impeachment.

¶ 76        Under the "*Montgomery* rule," evidence of a witness's prior criminal conviction is admissible to impeach his or her credibility when: (1) the conviction was for a crime punishable by death or imprisonment for more than one year, or the crime involved dishonesty or a false statement regardless of punishment; (2) less than 10 years has passed since the date of the conviction or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the conviction outweighs the danger of unfair prejudice. *People v. Montgomery*, 47 Ill. 2d 510, 516-17, 268 N.E.2d 695, 698-99 (1971). In balancing the probative value of the prior conviction against its potential prejudice, the trial court should consider factors such as "the nature of the prior conviction, its recency and similarity to the present charge, other circumstances surrounding the prior conviction, and the length of the witness' criminal record." *People v. Atkinson*, 186 Ill. 2d 450, 456, 713 N.E.2d 532, 535 (1999). The determination of whether a prior conviction is admissible for impeachment is within the trial court's discretion. *People v. Williams*, 173 Ill. 2d 48, 81, 670 N.E.2d 638, 654 (1996). A trial court abuses its discretion only when no reasonable person would take the court's view. *Illgen*, 145 Ill. 2d at 364.

¶ 77        Defendant concedes the first two requirements of the *Montgomery* rule are satisfied, but he argues evidence of his prior convictions should have been excluded because the

danger of unfair prejudice outweighed any probative value. The credibility of defendant's testimony was an important issue in this case. When a defendant's credibility is a "central issue," a prior conviction may be "crucial" in measuring the defendant's credibility. *Atkinson*, 186 Ill. 2d at 462. The convictions were recent, occurring in 2019 and 2020. Thus, the probative value of the prior convictions to impeach defendant's credibility was substantial in this case.

¶ 78    Any unfair prejudice from the convictions would not have been particularly significant. The offense of aggravated DUI is not a crime of violence or similar to the charges in this case. We conclude any danger of unfair prejudice from admitting the convictions for impeachment did not outweigh their probative value. Accordingly, the trial court did not abuse its discretion in admitting the prior convictions for impeachment in this case.

¶ 79                                D. Cumulative Error

¶ 80    Finally, defendant argues his convictions should be reversed because the cumulative effect of multiple errors deprived him of a fair trial. Defendant acknowledges he forfeited his cumulative error argument by failing to raise it in the trial court, but he asks this court to review it under the plain error doctrine.

¶ 81    The plain error doctrine allows a reviewing court to consider unpreserved errors when either

> "(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the

- 21 -

evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). The first step of plain error review is determining whether a clear or obvious error occurred. *Id.*

¶ 82   As discussed above, we have identified several errors in this case involving the admission of the statements from B.B.'s video interview. We have held the admission of those statements was harmless error. Defendant has not identified any other basis in his cumulative error argument for reversing his convictions. Because any errors in this case were harmless, we conclude defendant's cumulative error argument fails. Defendant has not established a clear or obvious error occurred, as required for review under the plain error doctrine.

¶ 83                                III. CONCLUSION

¶ 84        For the reasons stated, we affirm the trial court's judgment.

¶ 85        Affirmed.